**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK, LLC, *et al.*, | Case No. 22-10964 (MG) |
| Reorganized Debtors.[1] | (Jointly Administered) |
| In re: | Adv. Pro. No. 24-04024 (MG) |
| CELSIUS CUSTOMER PREFERENCE ACTIONS. | (Consolidated Docket) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANTS' JOINT MOTION TO WITHDRAW THE REFERENCE**</u>

**\*Relief is sought from a District Court Judge\***

---

[1]    The Post-Effective Date Debtors in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The Post-Effective Date Debtors' service address in these chapter 11 cases is the Corporation Trust Company, Registered Office of Celsius Network, LLC, 1209 Orange Street, Wilmington, DE 19801.

## <u>TABLE OF CONTENTS</u>

I.   BACKGROUND ...................................................................................................... 2

   A.   Factual Background ........................................................................................ 2

   B.   Procedural Background.................................................................................... 5

      1.   The Debtors' Plan of Reorganization ..................................................... 5

      2.   The Adversary Proceedings ................................................................... 6

II.  ARGUMENT.......................................................................................................... 9

   A.   Withdrawal of the reference is mandatory because substantial and material consideration is required of both the Bankruptcy Code and other federal laws in a complex matter of first impression. ................................................................................................... 9

      1.   Defendants' § 546(e) defense requires substantial consideration of non-bankruptcy federal law........................................................................................... 12

      2.   Defendants' § 546(g) defense also requires substantial consideration of non-bankruptcy federal law........................................................................................... 15

   B.   The Court should exercise its discretion to withdraw the reference. ................................. 15

      1.   The bankruptcy court lacks constitutional authority to enter final judgment on the claims at issue.............................................................................................. 16

      2.   Withdrawal of the reference at this time will ensure the most efficient use of judicial resources. ......................................................................................... 19

      3.   Withdrawal of the reference will not cause delay and will *reduce* the costs to the parties. 21

      4.   Withdrawal of the reference will not interfere with the uniformity of bankruptcy administration. ..................................................................................... 22

      5.   Forum shopping is not a concern here. ..................................................... 23

      6.   Other factors weigh in favor of withdrawal of the reference......................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Arbco Capital Mgmt., LLP*,
  479 B.R. 254 (S.D.N.Y. 2012)........................................................................16, 18

*Baxter v. Sherb & Co., LLP (In re Money Ctrs. of Am., Inc.)*,
  579 B.R. 710 (S.D.N.Y. 2016)....................................................................19, 20, 21

*Bear, Stearns Sec. Corp. v. Gredd*,
  2001 Westlaw 840187 (S.D.N.Y. July 25, 2001) ...................................................11

*Brown Publ'g Co. v. Brown*,
  2017 WL 455418 (E.D.N.Y. Feb. 1, 2017).............................................................23

*In re Cablevision S.A.*,
  315 B.R. 818 (S.D.N.Y. 2004)................................................................................11

*In re Celsius Network LLC*,
  655 B.R. 301 (Bankr. S.D.N.Y. 2023), *appeal dismissed*, No. 23 CIV. 10368
  (LGS), 2024 WL 3376496 (S.D.N.Y. July 11, 2024), *appeal dismissed* (Jan.
  17, 2025) ..............................................................................................................5, 6

*In re Celsius Network LLC*,
  670 B.R. 379 (S.D.N.Y. 2025)................................................................................21

*City of New York v. Exxon Corp.*,
  932 F.2d 1020 (2d Cir. 1991).................................................................................11

*Commodity Futures Trading Commission v. Celsius Network LLC*,
  Case No. 1:23-cv-06008 (S.D.N.Y. July 17, 2023) .............................................1, 4

*Complete Management Inc. v. Arthur Andersen, LLP*,
  2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002)......................................................24

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*,
  462 B.R. 457 (S.D.N.Y. 2011)..................................................................19, 21, 23, 24

*In re Empire Stat Grp., LLC*,
  2024 WL 3666381, at *8 (S.D.N.Y. Aug. 5, 2024) ................................................21

*In re Enron Corp.*,
  388 B.R. 131 (S.D.N.Y. 2008)................................................................................11

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*,
651 F.3d 329 (2d Cir. 2011) .......................................................................12

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*,
2004 Westlaw 2711101 (S.D.N.Y. Nov. 23, 2004) ...................................10

*In re Extended Stay, Inc.*,
466 B.R. 188 (S.D.N.Y. 2011).....................................................................10

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989).......................................................................................17

*Grede v. Fortis Clearing Am. LLC*,
2009 WL 3518159 (N.D. Ill. Oct. 28, 2009)...............................................11

*Guevoura Fund Ltd. v. Sillerman*,
2018 WL 6713124 (S.D.N.Y. Dec. 3, 2018) ...............................................22

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990).........................................................................10

*Kentile Floors, Inc. v. Congoleum Corp. (In re Kentile Floors, Inc.)*,
1995 WL 479512 (S.D.N.Y. Aug. 10, 1995) ................................................9

*Langenkamp v. Culp*,
498 U.S. 42 (1990).......................................................................................18

*In re Lehman Bros. Holdings Inc.*,
480 B.R. 179 (S.D.N.Y. 2012).....................................................................16

*In re MF Global Inc.*,
484 B.R. 18 (S.D.N.Y. 2012)..................................................................10, 11

*Mishkin v. Ageloff*,
220 B.R. 784 (S.D.N.Y.1998)..................................................................11, 20

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982).......................................................................................17

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir.1993)..............................................................16, 19, 21, 24

*Picard v. Avellino*,
469 B.R. 408 (S.D.N.Y. 2012).....................................................................22

*Picard v. HSBC Bank PLC*,
450 B.R. 406 (S.D.N.Y. 2011).....................................................................10

iii

*Picard v. JP Morgan Chase & Co.*,
    454 B.R. 307 (S.D.N.Y. 2011)......................................................................................10, 11

*In re Residential Cap., LLC*,
    527 B.R. 865 (S.D.N.Y. 2014)..................................................................................................23

*Roman Cath. Diocese of Rockville Ctr., New York v. Arrowood Indem. Co.*,
    2021 WL 1978560 (S.D.N.Y. May 17, 2021) ..........................................................19, 21, 23

*Roman Cath. Diocese of Rockville Ctr. v. Certain Underwriters at Lloyds, London*
    *& Certain London Market Co.*,
    634 B.R. 226 (S.D.N.Y. 2021)....................................................................................................9

*Sec. & Exch. Comm'n v. Arbitrade Ltd.*,
    2024 WL 962372 (S.D. Fla. March 6, 2024) .........................................................................12

*Sec. & Exch. Comm'n v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024).....................................................................................12

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
    682 F.Supp.3d 308 (S.D.N.Y. July 13, 2023) ........................................................................12

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
    684 F. Supp. 3d 170 (S.D.N.Y. 2023)....................................................................................12

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC*,
    486 B.R. 579 (S.D.N.Y. 2013)................................................................................................16

*Securities and Exchange Commission v. Celsius Network Limited*,
    Case No. 1:23-cv-06005 (S.D.N.Y. Nov. 1, 2023) ...................................................................4

*Solutia Inc. v. FMC Corp.*,
    2004 WL 1661115 (S.D.N.Y. July 27, 2004) .................................................................21, 22

*Stern v. Marshall*,
    564 U.S. 462 (2011)...................................................................................................15, 16, 17

*The Off. Comm. Of Unsecured Creditors of the VWE Grp., Inc. v. Amlicke (In re*
    *The VWE Grp., Inc.*),
    359 B.R. 441 (S.D.N.Y. 2007)....................................................................................................9

*United States v. Mashinsky*,
    Case No. 1:23-cr-00347-JGK (S.D.N.Y. July 11, 2023) ..................................................2, 3, 4

**Statutes**

11 U.S.C. § 101.............................................................................................................12, 13, 14, 15

11 U.S.C. § 510(b) ...........................................................................................................................5

11 U.S.C. § 546.................................................................................................. *passim*

11 U.S.C. § 547...................................................................................................7, 8

11 U.S.C. § 741....................................................................................................13

11 U.S.C. § 761....................................................................................................13

28 U.S.C. § 157.................................................................................................. *passim*

Defendants move to withdraw the reference to the bankruptcy judge of the adversary proceedings identified on Exhibit A hereto (the "Adversary Proceedings"). Defendants are former customers of Celsius Network, LLC ("Celsius"), a cryptocurrency-based financial services platform. During the 90 days prior to Celsius's bankruptcy, Defendants withdrew digital assets that they had previously deposited with Celsius. Plaintiff Mohsin Y. Meghji, as Litigation Administrator appointed under Celsius's plan of reorganization, seeks to avoid and recover over $200 million of those withdrawals[2] from Defendants as allegedly preferential transfers.

Defendants assert that the withdrawals were transfers in connection with securities contracts, commodities contracts, and/or swap agreements, and that Plaintiff is barred from avoiding and recovering such transfers by the safe harbors of 11 U.S.C. §§ 546(e) and 546(g). Withdrawal of the reference is mandated under 28 U.S.C. § 157(d) because determination of those defenses requires substantial consideration of federal securities and commodities law. Specifically, Defendants' safe harbor defenses hinge (among other things) upon whether (1) the agreements between Celsius and its customers were "securities contracts," "commodities contracts," "forward contracts," and/or "swap agreements"; (2) whether the digital assets and Celsius products at issue, including the Earn Program and Borrow Program (defined below) and various crypto tokens such as Celsius's native CEL token, are "securities" and/or "commodities" as defined under federal law; (3) whether transfers made by Celsius to its customers when those customers sought to withdraw their crypto assets were "settlement payments" and/or transfers in connection with a "securities contract," "commodities contract," "forward contract," or "swap agreement"; and (4) whether Celsius should be deemed a "stockbroker" and/or "commodity broker."

---

[2]    Plaintiff seeks to recover the current value of the coins that Defendants withdrew, which in some cases is many multiples of the value they actually received when they withdrew their assets from Celsius's platform.

Withdrawal of the reference is also warranted because the bankruptcy court lacks constitutional authority to finally adjudicate Defendants' private rights. In addition, Defendants have requested jury trials and do not consent to the bankruptcy judge's trial of this matter. 28 U.S.C. §§ 157(d), (e). Thus, even if the Court does not find mandatory withdrawal required, cause exists for permissive withdrawal as it will promote judicial economy while preserving Defendants' Seventh Amendment right to a jury.

## I.    BACKGROUND

### A.    Factual Background

Celsius Network Limited ("Celsius UK"), the original entity through which Celsius operated its retail customer-facing business, was launched in 2018 as a cryptocurrency-based financial services platform headquartered in the UK.[3] Through its mobile application and website, Celsius offered customers the ability to earn yield on a variety of digital assets in the form of weekly "rewards" payments (the "Earn Program"). Celsius represented to customers that "their rewards would equal each customer's share of up to 80% of Celsius's revenues."[4] Celsius also maintained a retail lending program (the "Borrow Program"), pursuant to which Celsius would make collateralized loans in fiat currency or stablecoins to its customers, secured by the customers' crypto deposited on the Celsius platform. If the value of the posted collateral dropped, the customers had to meet margin calls or risk liquidation of their collateral.[5] Celsius managed its customers' assets in the Earn Program and Borrow Program by pooling them and deploying them through retail lending, institutional lending, investments, exchange trading and other profit-

---

[3]    *Final Report of Shoba Pillay, Examiner*, Case No. 22-10964 (Bankr. S.D.N.Y. Jan. 31, 2023), ECF No. 1956 ("Examiner's Report"), at 66.

[4]    *Id.* at 4.

[5]    *Id.* at 72, 320.

seeking strategies.[6]

Celsius also promoted its native CEL token as the "backbone" of the Celsius ecosystem.[7] Customers would deposit their other digital assets, such as Bitcoin ("BTC") or Ethereum ("ETH"), and then earn yield that Celsius paid in the form of CEL tokens. At least in theory, Celsius would buy CEL tokens on the open market using its profits, driving up the price of the tokens. This would in turn attract more customer deposits, leading to more CEL rewards, more CEL purchases, and ever-higher valuations. Co-founder Alex Mashinsky referred to this as the "flywheel," and it was supposed to be (though in practice was not) self-sustaining.[8]

The regulatory status of Celsius's products was the subject of extensive scrutiny prior to the Debtors' bankruptcy filing. In mid-2021, due to "increased regulatory uncertainty . . . in the UK," Celsius Network LLC was formed as a Delaware limited liability company and all customer accounts were migrated (at least nominally) from Celsius UK to the new US entity.[9] However, this purported move did not help Celsius escape regulatory attention. In September 2021, the states of Alabama, New Jersey, and Texas announced cease-and-desist actions against Celsius concerning the company's Earn Program, which each state classified as an offering of unregistered securities.[10] Other states subsequently followed suit. In April 2022, citing "ongoing discussions with United

---

[6]   *See United States v. Mashinsky*, Case No. 1:23-cr-00347-JGK (S.D.N.Y. July 11, 2023), ECF No. 1 ("Indictment"), ¶ 12.

[7]   Examiner's Report at 5. CEL is an ERC-20 token on the Ethereum blockchain. *Id.* at 54.

[8]   *Id.* at 5, 80-82.

[9]   *Id.* at 68.

[10]  Order to Show Cause Why the Alabama Securities Commission Should Not Order Respondents to Cease and Desist from Further Offers or Sales of Securities in the State, *available at* https://asc.alabama.gov/wp-content/uploads/2023/11/SC-2021-0012.pdf#:~:text=ACCORDINGLY%2C%20IT%20IS%20HEREBY%20ORDERED%20that%20RESPONDENT,further%20violations%20of%20the%20Alabama%20Securities%20 Act; Summary Cease and Desist Order, *available at* https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf; Notice of Hearing, *available at* https://www.ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf.

States regulators regarding our Earn product," Celsius stopped offering the Earn Program with respect to new deposits from non-accredited investors in the United States.[11]

On July 13, 2022, in the midst of the "crypto winter" triggered by the collapse of the Terra stablecoin and its companion token, Luna,[12] Celsius filed for relief under chapter 11 of the Bankruptcy Code.

Exactly one year later, on July 13, 2023, the Securities and Exchange Commission filed a complaint against Celsius, alleging that the company wrongfully offered and sold both CEL and the Earn Program accounts as investment contracts (and, thus, as securities) without registering them.[13] The same day, the Commodity Futures Trading Commission sued Celsius for failing to register as a commodity pool operator, noting that a number of the digital assets pooled and deployed by Celsius—including BTC, ETH, USDC, and USDT, among others—are commodities.[14] On July 17, 2023, Celsius consented to entry of judgment against it in the CFTC lawsuit.[15] On November 1, 2023, Celsius consented to entry of judgment against it in the SEC lawsuit.[16]

To date, however, there has been no judgment on the merits regarding, among other things,

---

[11]   *See* Important Celsius Update for our Users in the United States, *available at* https://celsiusnetwork.medium.com/important-celsius-update-to-our-us-clients-6df471420cc7#:~:text=On%20April%2015%2C%202022%2C%20Celsius,%C2%B9.

[12]   Sandor, Krisztian, The Fall of Terra: A Timeline of the Meteoric Rise and Crash of UST and LUNA, CoinDesk (December 22, 2022), https://www.coindesk.com/learn/thefall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna/.

[13]   *Securities and Exchange Commission v. Celsius Network Limited*, Case No. 1:23-cv-06005 (S.D.N.Y. July 13, 2023), ECF No. 1.

[14]   *Commodity Futures Trading Commission v. Celsius Network LLC*, Case No. 1:23-cv-06008 (S.D.N.Y. July 13, 2023), ECF No. 1.

[15]   *Commodity Futures Trading Commission v. Celsius Network LLC*, Case No. 1:23-cv-06008 (S.D.N.Y. July 17, 2023), ECF No. 11.

[16]   *Securities and Exchange Commission v. Celsius Network Limited*, Case No. 1:23-cv-06005 (S.D.N.Y. Nov. 1, 2023), ECF No. 18.

the status of the Earn Program or Borrow Program accounts as investment contracts, commodity

contracts, or swap agreements; of CEL tokens as securities or commodities; or of Celsius itself as

a stockbroker or commodity broker.

### B.    Procedural Background

#### 1.    The Debtors' Plan of Reorganization

On November 9, 2023, the bankruptcy court confirmed the Debtors' *Modified Joint*

*Chapter 11 Plan of Reorganization* (the "Plan").[17] One of the most contentious issues that the

bankruptcy court had to address in connection with plan confirmation was the valuation of the

CEL token:

> Some creditors immediately rallied against any return for CEL
> holders, describing the token as "destined-to-be-worthless." . . .
> Debtors initially filed a Plan proposing a value of $0.20 per CEL
> Token. . . . Many other creditors vigorously opposed this proposal,
> arguing for a valuation of at least $0.81, the Petition Date price.[18]

A key question debated by the opposing sides was whether the CEL token was a security

and thus subject to subordination under 11 U.S.C. § 510(b).[19] However, during oral argument on

the Debtors' proposed settlement regarding the valuation of CEL tokens (the "CEL Settlement"),

the bankruptcy court expressed reluctance to address the status of CEL tokens head-on:

> THE COURT: My guess -- and I'm not anxious to
> decide whether it's a security or not one way or the other --
>
> MR. COLODNY: Reading the room, I understand that.

---

[17]    *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates*, Case No. 22-10964 (Bankr. S.D.N.Y. Nov. 9, 2023), ECF No. 3972.

[18]    *In re Celsius Network LLC*, 655 B.R. 301, 305 (Bankr. S.D.N.Y. 2023), *appeal dismissed*, No. 23 CIV. 10368 (LGS), 2024 WL 3376496 (S.D.N.Y. July 11, 2024), *appeal dismissed* (Jan. 17, 2025).

[19]    *See, e.g., Santos Caceres' Limited Objection to the Debtors' Entry for an Order (I) Approving the Adequacy of the Disclosure Statement in Regards to the Treatment of Non-Insider CEL Token Claims (II) Granting Related Relief*, Case No. 22-10964 (Bankr. S.D.N.Y. Aug. 1, 2023), ECF No. 3124; *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues with Respect to the Treatment of CEL Token under the Debtors' Plan of Reorganization*, Case No. 22-10964 (Bankr. S.D.N.Y. Sept. 7, 2023), ECF No. 3434.

> THE COURT: -- one way or the other.
>
> * * *
>
> THE COURT: I've already said I'm not -- as I've
> gone through these mental gymnastics, it seemed to me I
> didn't have to reach a result -- under some scenarios, I
> don't have to reach a result of deciding whether it is or is
> not a security. Okay. And at least my reading of Judge
> Rakoff's decision and Judge Torres' decision, they differ.
> Not that either one is necessarily the absolute answer as
> applied to the CEL token, but nevertheless. I have great
> respect for both Judge Rakoff and Judge Torres.[20]

Ultimately, in ruling on the CEL Settlement, the bankruptcy court expressly declined to

determine whether the CEL token is a security:

> For the avoidance of doubt, the Court needs not make a finding on
> whether CEL is a security in order to decide whether the CEL
> Settlement satisfies the best interests test. Creditors overwhelmingly
> accepted the Plan, and with it, the CEL Settlement. . . . The Court
> thus need not make a finding on whether CEL is a security, as that
> issue is not before the Court, and is preserved for any claimant who
> wishes to argue it.[21]

The Plan became effective on January 31, 2024 (the "Effective Date").[22]

### 2.    The Adversary Proceedings

In July 2024, Plaintiff Litigation Administrator, as representative for the post-Effective

Date Debtors appointed under the Plan, filed approximately 2,400 adversary proceedings against

former customers of Celsius, including the moving Defendants, seeking to avoid and recover

allegedly preferential transfers under sections 547 and 550 of the Bankruptcy Code, and to disallow

related claims under section 502(d) of the Bankruptcy Code. All of the complaints are substantially

---

[20]  Hrg. Tr., Case No. 22-10964 (Bankr. S.D.N.Y. Sept. 28, 2023), 18:8-12; 24:7-15.

[21]  *Celsius*, 655 B.R. at 313.

[22]  *Notice of Occurrence of Effective Date of Debtors' Modified Chapter 11 Plan of Reorganization and Commencement of Distributions*, Case No. 22-10964 (Bankr. S.D.N.Y. Jan. 31, 2024), ECF No. 4298.

identical.

Given the large number of adversary proceedings, the bankruptcy court created the above-captioned consolidated docket "for filings relating generally to litigation against certain customers of Celsius Network LLC and its affiliated post-effective date debtors who withdrew assets during the 90 days before the bankruptcy filing."[23] The bankruptcy court then entered an order staying all individual proceedings and directing Plaintiff and Defendants to litigate, collectively, certain issues of law and fact that would be common to many or all of the proceedings.[24]

The bankruptcy court divided the common issues litigation into two phases. Phase One, which would be determined before Defendants answered the complaints (and, indeed before some of them were even served with process), was intended to address issues that, Plaintiff's counsel argued to the bankruptcy court, "are purely legal issues that can be resolved on the briefing. There is [*sic*] no experts needed, no discovery needed."[25] Those issues included, and were limited to, (i) whether the presumption against extraterritoriality is applicable to the avoidance actions, and if so, whether 11 U.S.C. § 547 applies extraterritorially; (ii) whether the bankruptcy court has personal jurisdiction over non-US Defendants in connection with the adversary proceedings; and (iii) whether the definition of "Withdrawal Preference Exposure" under the Plan governs, or 11 U.S.C. §§ 547(c) and 550 govern, for purposes of calculating the amount of the Defendants' potential liability in the avoidance actions.[26]

---

[23]     *Copy of Certified Order Transferring Case*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Sept. 6, 2024), ECF No. 1.

[24]     *Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant To Sections 502, 547, and 550 of the Bankruptcy Code*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Nov. 7, 2024), ECF No. 36 ("Procedures Order").

[25]     Hrg. Tr., Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Oct. 8, 2024), 66:13-15.

[26]     Procedures Order, Ex. 2 at 1. As it transpired, to Defendants' surprise and over their objections, Plaintiff briefed and the bankruptcy court decided a fourth, factual issue: whether, ***as a factual matter***, the transfers at issue were domestic transfers. *See Memorandum Opinion and Order on Phase One Issues*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. July 29, 2025), ECF No. 77 ("Phase One Order"), at 5. The bankruptcy court relied for its factual finding

Phase Two would address fact-intensive issues requiring discovery and expert testimony: (i) whether Plaintiff's claims are barred by the ordinary business terms defense under 11 U.S.C. § 547(c)(2)(B); (ii) whether Plaintiff's claims are barred by the safe harbor defense under 11 U.S.C. § 546(e); and (iii) whether the presumption of insolvency during the preference period can be rebutted.[27] While these are not Defendants' only defenses, they are the primary complete defenses asserted by every Defendant and would, if successful, completely dispose of these Adversary Proceedings.

In their limited objection to the Procedures Order, Defendants expressly reserved their right to seek withdrawal of the reference. Defendants noted that "[s]uch a right is guaranteed to the Defendants by statute and cannot be abrogated in the name of expedience. Nor should Defendants' consent to the Phase 2 schedule be deemed to be a waiver of their right to seek withdrawal of the reference."[28] At the hearing on the Procedures Order, the bankruptcy court confirmed that Defendants' right to seek withdrawal of the reference was not affected: "Next, the issue about withdrawal of the reference. I think that issue has been worked out. The litigation administrator makes clear that nothing in the proposed procedures inhibits the defendants' right to bring a motion to withdraw the reference."[29]

---

on the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues*, filed in the main bankruptcy case in connection with a matter to which Defendants were not parties. *Id.* at 30. Defendants were not given an opportunity to cross-examine Mr. Blonstein or offer their own evidence on this issue, let alone submit such evidence to a jury for determination.

[27]  Procedures Order, Ex. 2 at 2.

[28]  *Limited Objection of the Troutman Group and Lowenstein Group to Plaintiff's Revised Motion for an Order Establishing Streamlined Procedures Governing Avoidance Actions Pursuant to Sections 502, 547 and 550 of the Bankruptcy Code*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Sept. 24, 2024), ECF No. 11, at 7-8. Defendants focused in their limited objection on the mandatory withdrawal of their § 546(e) safe harbor defense, as no answers had yet been filed nor any jury demands yet made.

[29]  Hrg. Tr., Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Oct. 8, 2024), 102:17-21.

The bankruptcy court entered the Phase One Order on July 29, 2025, triggering a 30-day deadline for responses to the complaints. On August 13, 2025, the bankruptcy court entered a scheduling order for Phase Two.[30] The bankruptcy court declined Defendants' requests to be given the same amount of time for fact discovery as Plaintiff, for an opportunity to file a summary judgment motion if warranted after fact discovery, and for the inclusion in the schedule a mandatory meet-and-confer to discuss alternative dispute resolution.[31] Instead, the Phase Two Scheduling Order *only* provides for trial briefs and a single bench trial of the evidence on all three Phase Two issues after a relatively short fact discovery period in which Defendants must complete all fact discovery on their core defenses by December 10, 2025, while Plaintiff is allowed to continue his fact discovery of Defendants until February 11, 2026. Trial briefing is set to be completed by May 27, 2026 with trial to be scheduled thereafter.[32]

On or about August 28, 2025, Defendants filed their answers. In their first individual pleadings in the Adversary Proceedings, each Defendant asserted, among other defenses, the safe harbors of 11 U.S.C. §§ 546(e) and (g). In addition, each Defendant asserted the right to a jury trial and expressly declined to consent to entry of final orders or judgment or the conduct of a jury trial by the bankruptcy court.

## II.    ARGUMENT

### A.    Withdrawal of the reference is mandatory because substantial and material consideration is required of both the Bankruptcy Code and other federal laws in a complex matter of first impression.

Section 157(d) of the Judicial Code provides that:

---

[30]    *Order Establishing Phase Two Schedule and Related Procedures*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Aug. 13, 2025), ECF No. 83 (the "Phase Two Scheduling Order").

[31]    *See Letter to the Honorable Martin Glenn requesting entry of proposed scheduling order*, Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Aug. 12, 2025), ECF No. 81.

[32]    Phase Two Scheduling Order, Ex. 1 at 2-3.

> The district court shall, on timely motion of a party,[33] so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

Under this provision, "a litigant can *mandate* withdrawal of the bankruptcy reference where the movant shows that, absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'" *Picard v. HSBC Bank PLC*, 450 B.R. 406, 409 (S.D.N.Y. 2011) (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)) (emphasis in original); *see also In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990) (same); *Picard v. JP Morgan Chase & Co.*, 454 B.R. 307, 312 (S.D.N.Y. 2011) (same); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, 2004 Westlaw 2711101 at *2 (S.D.N.Y. Nov. 23, 2004) (providing that the reference of any proceeding that involves "substantial and material consideration" of non-bankruptcy federal law must be withdrawn) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l*, 922 F.2d 984, 995 (2d Cir. 1990)). "Mandatory withdrawal is therefore appropriate where the case would require 'the bankruptcy court to engage itself in the intricacies' of non-bankruptcy law, as opposed to 'routine application' of that law or the 'straightforward application of a federal statute to a particular set of facts.'" *In re Extended Stay, Inc.*, 466 B.R. 188, 196 (S.D.N.Y. 2011) (citations omitted).

---

[33] Defendants' motion to withdraw the reference was filed within two business days after the deadline to answer complaints. Accordingly, the motion is timely. *See Kentile Floors, Inc. v. Congoleum Corp. (In re Kentile Floors, Inc.)*, 1995 WL 479512, at *2 (S.D.N.Y. Aug. 10, 1995) (explaining that a defendant "did not have grounds for a motion to withdraw the reference until it filed an answer and jury demand"); *see also The Off. Comm. Of Unsecured Creditors of the VWE Grp., Inc. v. Amlicke (In re The VWE Grp., Inc.)*, 359 B.R. 441, 447 (S.D.N.Y. 2007) (motion timely because it was filed with the jury demand); *Roman Cath. Diocese of Rockville Ctr. v. Certain Underwriters at Lloyds, London & Certain London Market Co.*, 634 B.R. 226, 233 (S.D.N.Y. 2021) (holding that a motion to withdraw reference was timely when filed it eight days after the answer).

Withdrawal of the reference involving substantial consideration of non-bankruptcy federal law is mandatory "regardless of whether the bankruptcy judge is familiar with the non-bankruptcy federal law." *In re MF Global Inc.*, 484 B.R. 18, 22 (S.D.N.Y. 2012). Likewise, mandatory withdrawal does not depend on whether the matter to be decided falls within the bankruptcy court's "core" or "non-core" jurisdiction. *New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (noting that even matters within the bankruptcy court's "core" jurisdiction "must be withdrawn under § 157(d) if they require the bankruptcy court to substantially interpret federal statutes which affect interstate commerce").

Furthermore, "the burden of establishing a right to mandatory withdrawal is more easily met" where matters of first impression are concerned. *See Bear, Stearns Secs. Corp. v. Gredd*, 2001 WL 840187, at *2 (S.D.N.Y. July 25, 2001); *Mishkin v. Ageloff*, 220 B.R. 784, 785 (S.D.N.Y.1998).

Withdrawal has been found mandatory where significant interpretation of the securities laws or commodities laws is required. *See, e.g.*, *SIPC v. Bernard L. Madoff Investment Securities LLC (In re Madoff)*, 454 B.R. 307, 312 (S.D.N.Y. 2011) (withdrawing reference to consider issues under SIPA securities laws); *Bear, Stearns*, 2001 Westlaw 840187 at *4, (withdrawal mandatory where SEC rule potentially precluded application of the Bankruptcy Code avoidance provisions because debtor would not have an interest in the subject property); *In re Cablevision S.A.*, 315 B.R. 818, 821 (S.D.N.Y. 2004) (withdrawal mandatory where there was a dispute regarding the applicability of non-Bankruptcy Code federal statutes); *In re Enron Corp.*, 388 B.R. 131, 140 (S.D.N.Y. 2008) (withdrawal mandatory where trustee's theory of secondary liability under section 550(a)(1) of the Bankruptcy Code, if it were reached, involved substantial and material consideration of the Securities Act of 1933); *MF Global*, 484 B.R. at 25 (withdrawal mandatory

11

where resolution of the proceeding would necessitate significant interpretation of a regulation promulgated under the Commodity Exchange Act); *Grede v. Fortis Clearing Am. LLC*, 2009 WL 3518159, at *3-4 (N.D. Ill. Oct. 28, 2009) (withdrawal mandatory where case would require significant consideration of the Commodity Exchange Act).

Here, as the bankruptcy court recognized, "[t]he safe harbor defense . . . it's really a question of first impression in crypto cases."[34] Not only is it a matter of first impression, it turns on the complicated question of what constitutes a security[35]—something that requires substantial consideration of federal securities laws and has already given rise to a number of divergent opinions in the crypto context. *See, e.g., Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287–88 (S.D.N.Y. 2024), motion to certify appeal granted, 761 F. Supp. 3d 702 (S.D.N.Y. 2025) ("Of note, both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'") (collecting cases); *Sec. & Exch. Comm'n v. Ripple Labs, Inc*., 682 F.Supp.3d 308, 328-29 (S.D.N.Y. July 13, 2023) (sales of crypto tokens were not sales of unregistered securities when sold on the secondary market); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023) (disagreeing with the *Ripple* court's reasoning and conclusion). *Cf. Sec. & Exch. Comm'n v. Arbitrade Ltd*., 2024 WL 962372 (S.D. Fla. March 6, 2024) (comparing *Terraform* and *Ripple*).

    **1.  Defendants' § 546(e) defense requires substantial consideration of non-bankruptcy federal law.**

Section 546(e) of the Bankruptcy Code provides, in relevant part, that a trustee:

---

[34]  Hrg. Tr., Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Oct. 11, 2024), 98:6-8.

[35]  Or, alternatively, what constitutes a commodity or a swap.

may not avoid a transfer that is a . . . **settlement payment**,[36] as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a **commodity broker**,[37] **forward contract merchant**,[38] **stockbroker**, [39] financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a **commodity broker**, **forward contract merchant**, **stockbroker**, financial institution, financial participant, or securities clearing agency, in connection with a **securities contract**, [40] as defined in section 741(7), **commodity contract**, [41] as defined in

---

[36]  The Bankruptcy Code circularly defines "settlement payment" to mean, "for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A). In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329 (2d Cir. 2011), the Second Circuit, focusing on the plain meaning of the safe harbor statute, determined that "settlement payment" should be broadly construed as involving "a transaction involving the exchange of money for **securities**." *See id.* at 337 (emphasis added).

[37]  A "commodity broker" is a "futures commission merchant, foreign futures commission merchant, clearing organization, **leverage transaction merchant**, or **commodity options dealer**, as defined in section 761 of this title, with respect to which there is a customer, as defined in section 761 of this title." 11 U.S.C. § 101(6) (emphasis added).

A "**leverage transaction merchant**" is defined as a "person in the business of engaging in leverage transactions," while "leverage transactions" are defined expressly by reference to the Commodity Exchange Act: "'**leverage transaction**' means agreement that is subject to **regulation under section 19 of the Commodity Exchange Act**, and that is commonly known to the commodities trade as a margin account, margin contract, leverage account, or leverage contract." 11 U.S.C. §§ 761(13)-(14) (emphasis added).

A "**commodity options dealer**" is a "person that extends credit to, or that accepts cash, a security, or other property from, a customer of such person for the purchase or sale of an interest in a commodity option." 11 U.S.C. § 761(6). The Bankruptcy Code defines "**commodity option**" as an agreement or transaction subject to **regulation under section 4c(b) of the Commodity Exchange Act**. 11 U.S.C. § 761(5).

[38]  Under the Bankruptcy Code, "[t]he term '**forward contract merchant**' means . . . an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a **commodity** (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101(26) (emphasis added).

[39]  A "**stockbroker**" is a "person (A) with respect to whom there is a customer, as defined in section 741 of this title, and (B) that is engaged in the business of effecting transactions in **securities** (i) for the account of others; or (ii) with members of the general public, from or for such person's own account." 11 U.S.C. § 101(53A) (emphasis added).

[40]  The Bankruptcy Code defines "**securities contract**," in relevant part, to mean "a contract for the purchase, sale, or loan of a **security** . . . any **margin loan**; any extension of credit for the clearance or settlement of **securities transactions** . . . any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph. . . ." 11 U.S.C. § 741(7)(A) (emphasis added). The term "**margin loan**" is not defined in the Bankruptcy Code.

[41]  A "**commodity contract**" is defined, in relevant part, as a "contract for the purchase or sale of a **commodity** for future delivery on, or subject to the rules of, a contract market or board of trade," a "**leverage transaction**," a "**commodity option**," or "any other contract, option, agreement, or transaction that is similar to a contract, option, agreement, or transaction referred to in this paragraph." 11 U.S.C. § 761(4) (emphasis added).

13

> section 761(4), or **forward contract**,[42] that is made before the commencement of the case. . . .

11 U.S.C. § 546(e) (emphases added).

Each of the bolded terms, in turn, leads to additional definitions under the Bankruptcy Code, but all of them ultimately boil down to the same questions: Is this a security? Is it a commodity? Is this a transaction that constitutes regulated activity under the Commodity Exchange Act? Under the Securities Act or Securities Exchange Act?

These questions, which will be central to the determination of whether § 546(e)'s safe harbor applies to the cryptocurrency transactions at issue, require substantial consideration and interpretation of non-bankruptcy federal law. The Bankruptcy Code punts entirely on the definition of "commodity," stating only that that term has the meaning assigned to it in the Commodity Exchange Act. 11 U.S.C. § 761(8). The term "margin loan" is not defined at all, requiring the Court to look to federal regulations such as 12 C.F.R. § 220 (Reg T) and 12 C.F.R. § 221 (Reg U) for interpretation. And while the Bankruptcy Code provides a non-exhaustive list of instruments encompassed by the term "security," *see* 11 U.S.C. 101(49)(A), it fails to shed any light on whether products such as the Earn Program, Borrow Program, CEL token or other tokens on Celsius's platform would be deemed to be securities. Only analysis of federal securities law can provide that answer.

The bankruptcy court already (correctly) declined to decide whether the CEL token is a security, citing the unsettled nature of non-bankruptcy federal law on this point. But unlike the

---

[42] A "**forward contract**," is defined to mean "a contract (other than a commodity contract, as defined in section 761) for the purchase, sale, or transfer of a **commodity**, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a . . . swap, hedge transaction, deposit, loan, . . . or any other similar agreement." 11 U.S.C. § 101(25) (emphasis added).

CEL Settlement—where the bankruptcy court was able to approve the settlement without deciding the securities law issue—Defendants' safe harbor defenses *cannot* be determined without substantial and material consideration of federal securities and commodities laws and regulations. Accordingly, withdrawal of the reference is mandatory.

> ### 2. Defendants' § 546(g) defense also requires substantial consideration of non-bankruptcy federal law.

Section 546(g) of the Bankruptcy Code provides, in relevant part, that a "trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case." 11 U.S.C. § 546(g). A "swap participant" is defined as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). The Bankruptcy Code defines "swap agreement" as any of a number of different types of swaps. However, "swap" is not itself a defined term in the Bankruptcy Code. To interpret this term and how it might apply to Celsius's products and transactions, the Court would have to look to non-bankruptcy federal law such as § 1a(47) of the Commodity Exchange Act, § 3(a)(69) of the Securities Exchange Act, and the regulations promulgated thereunder. This constitutes a further basis for mandatory withdrawal of the reference.

> ### B.    The Court should exercise its discretion to withdraw the reference.

Alternatively, the Court should withdraw the reference as a matter of discretion pursuant to § 157(d), which provides in relevant part that "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). As this Court has explained, the Second Circuit, prior to the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), directed that the district court weigh several factors to determine whether a party has shown "cause" for permissive

withdrawal, including:

> (1) whether the claim [or proceeding] is core or non-core, (2) what
> is the most efficient use of judicial resources, (3) what is the delay
> and what are the costs to the parties, (4) what will promote
> uniformity of bankruptcy administration, (5) what will prevent
> forum shopping, and (6) other related factors.

*In re Lehman Bros. Holdings Inc.*, 480 B.R. 179, 188 (S.D.N.Y. 2012) (paraphrasing *In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir.1993)) (alteration in original).

However, the first *Orion* factor has since been supplanted. "[I]n evaluating a motion to withdraw post-*Stern,* the principal question is no longer whether the claim in question is 'core' or 'non-core' pursuant to the Bankruptcy Code but whether the bankruptcy court has *constitutional authority* to enter final judgment on the claims at issue." *Id.* (citing *In re Arbco Capital Mgmt., LLP,* 479 B.R. 254, 262 (S.D.N.Y. 2012); *Weisfelner v. NAC Investments LLC*, 467 B.R. 712, 719 (S.D.N.Y. 2012); *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 463-64 (S.D.N.Y. 2011)) (emphasis in original). In fact, "whether or not a bankruptcy court has constitutional authority to enter a final decision in the particular action may be the most important factor in determining the permissive withdrawal of the reference." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC*, 486 B.R. 579, 584 (S.D.N.Y. 2013).

Here, each of the *Orion* factors, as formulated post-*Stern*, weighs in favor of withdrawal of the reference.

### 1.    The bankruptcy court lacks constitutional authority to enter final judgment on the claims at issue.

"In analyzing whether the bankruptcy court may constitutionally enter a final judgment, in turn, the Court considers the three factors emphasized in *Stern:* 1) whether the defendant filed a proof of claim in the bankruptcy proceeding, 2) whether the right is public or private, and 3) whether the parties consented to have the bankruptcy court enter final judgment." *Arbco*, 479 B.R.

at 262.

**First**, the vast majority of Defendants did not file proofs of claim in the Debtors'
bankruptcy cases. Virtually all[43] of those few who did file proofs of claim voluntarily expunged
their claims long before the Adversary Proceedings commenced by not opting out of class
settlement under the Debtors' Plan.[44] Since there are no proofs of claim for the bankruptcy court
to determine, Plaintiff's preference claims are not "part of the process of allowance and
disallowance of claims." *Cf. Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989).

**Second**, Plaintiff's preference claims against Defendants implicate private rights that may
only be determined by an Article III court. The "public rights" exception allows Congress
constitutionally to assign certain cases to legislative courts for resolution. *Stern*, 564 U.S. at 485.
In *Northern Pipeline*, the plurality opinion "concluded that this 'public rights' exception extended
'only to matters arising between' individuals and the Government 'in connection with the
performance of the constitutional functions of the executive or legislative departments . . . that
historically could have been determined exclusively by those' branches." *Id.* (quoting *Northern
Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67-68 (1982)). By contrast, "Congress
may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a
suit at the common law, or in equity, or admiralty.'" *Id.* at 484 (quoting *Murray's Lessee v.
Hoboken Land & Improvement Co.,* 59 U.S. 272 (1856)). Preferences originally were claims at
law that existed entirely outside of the bankruptcy regime. As the Supreme Court has explained,
"[p]rior to passage of the Bankruptcy Reform Act of 1978 . . . '[s]uits to recover preferences
constitute[d] no part of the proceedings in bankruptcy.'" *Granfinanciera, S.A. v. Nordberg*, 492

---

[43] To the best of Defendants' knowledge, just one Defendant out of the 114 moving Defendants has a pending proof
of claim.

[44] Plan at 39.

U.S. 33, 49 (1989) (quoting *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 94-95 (1932).

Defendants that hold no proofs of claim are entitled to a jury trial on the legal claims asserted against them. *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) ("If a party does *not* submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial.") (emphasis in original). Furthermore,

> *Granfinanciera* makes clear that the analysis with respect to a defendant's right under the Seventh Amendment to a jury trial translates to the Article III context: "the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." 492 U.S. at 53, 109 S.Ct. 2782. Since a preference defendant is entitled to a jury trial before an Article III court where it has not filed a proof of claim against the bankruptcy estate, it follows that the preference defendant is entitled to have its claim finally adjudicated by an Article III judge.

*Arbco*, 479 B.R. at 266. Accordingly, "preferential transfer claims, where, as here, the preference defendant has filed no proof of claim against the bankruptcy estate, are matters of private right." *Id.*

**Third**, Defendants have not consented to have the bankruptcy court enter final judgment. As discussed above, in their objection to the Procedures Order, Defendants reserved their right to seek withdrawal of the reference. And in their answers to the complaints, each Defendant expressly declined to consent to allow the bankruptcy court to enter final judgment.

Thus, each of the three relevant factors demonstrates that the bankruptcy court lacks constitutional authority to enter final judgment on the claims at issue in these Adversary Proceedings.

### 2.    Withdrawal of the reference at this time will ensure the most efficient use of judicial resources.

The bankruptcy court's involvement in these adversary proceedings has been limited to determining the three discrete legal issues raised in Phase One—none of which has any bearing on Defendants' Phase Two defenses or on any other specific facts or defenses in Defendants' individual Adversary Proceedings.[45] The bankruptcy court has not had to consider or rule on motions to dismiss. It has not been involved in any pretrial discovery, as discovery has not yet commenced. Moreover, the key issues that must be determined in ruling on Defendants' safe harbor defenses involve securities and commodities laws, not bankruptcy law. "[I]t is a waste of judicial resources for a court of specialized bankruptcy knowledge to administer a case that does not require application of that knowledge." *Baxter v. Sherb & Co., LLP (In re Money Ctrs. of Am., Inc.)*, 579 B.R. 710, 715 (S.D.N.Y. 2016) Accordingly, there are no particular efficiencies to be gained by leaving these matters with the bankruptcy court.

Moreover, the bankruptcy court cannot enter final judgment on the claims at issue; that authority is reserved to the Article III court. Nor can it conduct the jury trials to which Defendants are entitled under the Seventh Amendment. *Roman Cath. Diocese of Rockville Ctr., New York v. Arrowood Indem. Co.*, 2021 WL 1978560, at *10 (S.D.N.Y. May 17, 2021) ("Bankruptcy courts are prohibited from conducting jury trials on claims over which they lack final adjudicative authority.") (citing *Orion*, 4 F.3d at 1101; *FKF 3, LLC*, 2016 WL 4540842, at *14 n.11 (extending *Orion* to matters that fall beyond a bankruptcy court's final adjudicative authority)). Thus, any determination or proposed findings of the bankruptcy court will be subject to *de novo* review by this Court, an inherently inefficient duplication. *Dev. Specialists*, 462 B.R. at 472 ("Because the

---

[45] For the avoidance of doubt, Defendants recognize the wisdom in the bankruptcy court's consolidation of their Adversary Proceedings for the determination of common issues of law and fact, and anticipate that this Court would require similar consolidation.

Bankruptcy Court is not able to finally determine these proceedings without the consent of the Firms—which does not appear to be forthcoming—any recommendations it makes will need to be reviewed *de novo* in this Court. It would be inefficient to allow these proceedings to go forward, knowing that they will have to be substantially repeated."); *see also Baxter*, 579 B.R. at 714 (noting that judicial efficiency militates in favor of withdrawal because "[t]his extra layer of review can be avoided if the matter is withdrawn to the district court").

Withdrawal of the reference of the proceedings immediately will enhance judicial economy by eliminating duplicative proceedings and enabling this Court to develop familiarity with these complex matters of first impression. "The sooner the action is transferred to the district court, the sooner *that* court can familiarize itself with the case and shepherd it to a resolution. The parties do not obtain any benefit from the case being before the Bankruptcy Court." *Id*. Similarly, as this Court explained in *Mishkin v. Ageloff*,

> I have found that in complicated cases such as this, oversight of the pretrial proceedings provides me with insight into the precise nature of the claims and the theories upon which they are based. For these same reasons, I further decline to submit the motion to dismiss to the bankruptcy court for proposed findings of fact and conclusions of law. This would only generate another level of briefing and expense since I have little doubt, given the tone of the briefing on the motions before me, that whatever the outcome of such a decision, one side would argue that it was in error.

*Mishkin v. Ageloff*, 220 B.R. 784, 801 n.13 (S.D.N.Y. 1998). Here, similarly, whatever the outcome of Phase Two (or of the individual Adversary Proceedings), one side or the other will certainly challenge the bankruptcy court's proposed findings, generating "another level of briefing and expense."

The *Mishkin* court found that immediate withdrawal of the reference would be more efficient even though it was "difficult at this stage to predict the likelihood that these matters will proceed to trial, especially in light of the pending motions to dismiss." *Id.* Its reasoning is all the

more persuasive here, where Defendants have not filed motions to dismiss and it is a virtual certainty that Phase Two, at least, *will* proceed to trial if left in the bankruptcy court because that is what the bankruptcy court's Phase Two Scheduling Order mandates. Furthermore, this is not a case where there will be extended discovery and motion practice—though Defendants certainly believe that they ought to have been given at least as much time for fact discovery as Plaintiff was granted, and that summary judgment motions should have been contemplated as part of the Phase Two Scheduling Order. But the bankruptcy court rejected Defendants' requests for equal time for discovery and that the Phase Two Scheduling Order give the parties an opportunity to file motions for summary judgment. Instead, the bankruptcy court has put the parties on a rocket docket with just one destination: a bench trial of the evidence in the bankruptcy court less than ten months from now. Given this accelerated time frame, it makes little sense to defer withdrawal of the reference to a later date.

### 3. Withdrawal of the reference will not cause delay and will *reduce* the costs to the parties.

The Adversary Proceedings are at the nascent stage.[46] Answers to the complaints were due just two business days ago. There are no motions to dismiss pending, and no discovery has yet taken place. Thus, "bringing the actions before this Court will not cause undue delay or require any duplication of effort." *Dev. Specialists*, 462 B.R. at 472. Just the opposite: Defendants "will be prejudiced by the cost and delay of having to multiply proceedings" with a second layer of

---

[46] The fact that these cases are not trial ready does not suggest that leaving them in the bankruptcy court is warranted. "[C]ourts often grant withdrawals of the reference even if a case is in an early posture, so long as the other *Orion* factors weigh in favor of doing so." *In re Celsius Network LLC*, 670 B.R. 379, 396 (S.D.N.Y. 2025); s*ee also In re Empire Stat Grp., LLC*, 2024 WL 3666381, at *8 (S.D.N.Y. Aug. 5, 2024) (observing that the case was "unlikely to be tried" and was "more likely to settle or to be resolved on dispositive motions," but nevertheless granting withdrawal of bankruptcy reference given the other *Orion* factors); *Arrowood*, 2021 WL 1978560, at *11 (holding that the *Orion* factors supported withdrawal of the reference, despite the fact that the case was "in its early stages" and was "far from trial ready"). Moreover, as discussed above, the Phase Two Scheduling Order requires these Adversary Proceedings to be trial ready in less than ten months.

review by this Court. *Baxter*, 579 B.R. at 713; *Solutia Inc. v. FMC Corp.*, 2004 WL 1661115, at *3 (S.D.N.Y. July 27, 2004) ("If this Court did not withdraw the reference it would conduct a *de novo* review of the bankruptcy court's rulings, resulting in relitigation of claims and significant additional costs and expenditure of time and effort to both parties.").

Where the bankruptcy court's findings are subject to *de novo* review, "[t]his factor ***strongly*** favors withdrawal of the reference," which will avoid excessive cost and delay. *Solutia*, 2004 WL 1661115, at *3 (emphasis added). Concerns about cost and delay are particularly relevant here, where Plaintiff has a $50+ million litigation war chest and Defendants—who are, for the most part, ordinary individuals with mortgages and grocery bills—are at a steep structural disadvantage. Eliminating an unnecessary layer of litigation will help level the playing field.

> ### 4.    Withdrawal of the reference will not interfere with the uniformity of bankruptcy administration.

Whether a bankruptcy court has the power to adjudicate the claims at issue "ineluctably affects considerations such as . . . whether bankruptcy courts can administer the relevant laws." *Picard v. Avellino*, 469 B.R. 408, 413 n.3 (S.D.N.Y. 2012). Here, as discussed above, the bankruptcy court lacks constitutional authority to finally adjudicate the claims at issue here. As a result, withdrawal of the reference cannot affect the uniformity of bankruptcy administration, since this Court will be the forum in which the claims ultimately are decided in any event.

Furthermore, Defendants' safe harbor defenses primarily require analysis of securities and commodities laws, neither of which will affect the uniformity of bankruptcy administration. *Cf. Guevoura Fund Ltd. v. Sillerman*, 2018 WL 6713124, at *6 (S.D.N.Y. Dec. 3, 2018) ("Guevoura's securities fraud allegations do not require an analysis of bankruptcy law, and thus will not adversely impact the uniformity of bankruptcy administration."). And the defenses themselves present issues of first impression in the cryptocurrency context, as the bankruptcy court noted:

"The safe harbor defense . . . it's really a question of first impression in crypto cases." *See* Hrg. Tr., Adv. Pro. No. 24-04024 (Bankr. S.D.N.Y. Oct. 11, 2024), 98:6-8. This Court is better equipped to determine issues of non-bankruptcy federal law, and the bankruptcy court has no particular advantage with respect to an issue of first impression. *Cf. In re Residential Cap., LLC*, 527 B.R. 865, 872 (S.D.N.Y. 2014) ("Although Judge Glenn has an unparalleled depth of familiarity with the underlying bankruptcy case, relevant settlements and the Plan, the issues at the heart of this adversary proceeding are contract law questions under Minnesota law, as to which the bankruptcy court does not have a unique advantage. . . . Thus, questions of efficient use of judicial resources do not favor even pretrial management of this proceeding by the bankruptcy court, and uniformity of bankruptcy administration is not a salient factor.").

Because the key issues to be decided in these cases arise under federal securities and commodities laws, and because there are no other bankruptcy decisions with which to achieve uniformity, this factor is largely irrelevant.

### 5.    Forum shopping is not a concern here.

As discussed above, Defendants are entitled to have the Adversary Proceedings, which implicate only private rights, finally determined by an Article III court. "Because the Bankruptcy Court cannot enter a final judgment over these claims, this matter will end up before a district court regardless of the outcome of this motion. Accordingly, withdrawal of the bankruptcy reference does not promote forum shopping." *Arrowood*, 2021 WL 1978560, at *11; *see also Brown Publ'g Co. v. Brown*, 2017 WL 455418, at *5 (E.D.N.Y. Feb. 1, 2017) (holding that the inability of a bankruptcy court to enter a final judgment eliminates concerns over forum shopping).

Nor does withdrawing the reference immediately, rather than deferring withdrawal to a later stage of litigation, raise concerns about forum shopping. "[T]he Court does not condone forum shopping by allowing them to come here sooner rather than later." *Dev. Specialists*, 462

B.R. at 473. Indeed, "because this Court would have to review [the bankruptcy court's] conclusions of law *de novo* were the case left in the Bankruptcy Court . . . there is no reason not to do now what must be done eventually." *Id.*

### 6.    Other factors weigh in favor of withdrawal of the reference.

Additional factors that courts consider in analyzing whether permissive withdrawal is appropriate include whether the parties have requested a jury trial, and whether the legal issues to be resolved are of a type usually determined by the district court rather than the bankruptcy court. *Orion*, 4 F.3d at 1101; *see also Complete Management Inc. v. Arthur Andersen, LLP*, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002) (granting permissive withdrawal of the reference based on a number of factors, including that the "adversary proceeding raises legal issues more commonly resolved by this court than the bankruptcy courts, and the advancement of this action will involve extensive discovery, expert testimony, and a lengthy and complex trial requiring a jury").

As discussed above, Defendants are entitled to jury trials, have requested jury trials, and have not consented to the conduct of such jury trials by the bankruptcy court. Furthermore, the legal issues raised by Defendants' safe harbor defenses, which require substantial interpretation of federal securities and commodities laws and regulations, are the types of "legal issues more commonly resolved by this court than the bankruptcy courts." *Complete Management*, 2002 WL 31163878, at *3. Thus, both of these additional factors favor permissive withdrawal.

### <u>CONCLUSION</u>

Defendants have asserted safe harbor defenses that require significant interpretation of federal securities and commodities laws and their relationship with the Bankruptcy Code in a matter of first impression. These issues are of great consequence not just for Defendants, but for the thousands of Celsius customers sued by Plaintiff and, indeed, for the cryptocurrency markets

generally. The reference of these Adversary Proceedings, therefore, is subject to mandatory withdrawal from the bankruptcy court. Alternatively, ample cause exists for this Court to exercise its broad discretion to withdraw the reference.

For the foregoing reasons, Defendants respectfully request that the Court withdraw the reference of the Adversary Proceedings pursuant to 11 U.S.C. § 157(d).

[*Remainder of page intentionally left blank.*]

Dated: September 2, 2025
      New York, New York

Respectfully submitted,

**TROUTMAN PEPPER LOCKE LLP**

/s/ *Deborah Kovsky-Apap*
Deborah Kovsky-Apap
Robert S. Hertzberg
Vienna Messina
875 Third Avenue
New York, NY 10022
Telephone: 212-704-6000
deborah.kovsky@troutman.com
robert.hertzberg@troutman.com
vienna.messina@troutman.com

*Attorneys for the Troutman Defendants*

**LOWENSTEIN SANDLER LLP**

/s/ *Daniel B. Besikof*
Daniel B. Besikof
Brittany M . Clark
1251 Avenue of the Americas
New York, New York 10020
Tel:  212-262-6700
dbesikof@lowenstein.com
bclark@lowenstein.com

*Attorneys for the Lowenstein Defendants*

**BRESSLER, AMERY & ROSS P.C.**

/s/*Christopher M. Vaughan*
Christopher M. Vaughan, Esq.
Louis F. Mendez, Esq.
17 State Street 34th Floor
New York, New York 10004
Tel:  212-495-9300
cvaughan@bressler.com
lmendez@bressler.com

*Attorneys for The Bressler Defendants*

26

**PROSKAUER ROSE LLP**

/s/ *Brian Rosen*
Brian Rosen
Eleven Times Square
New York, NY 10036-8299
Tel: 212.969.3380
Email: brosen@proskauer.com

*Attorneys for Coinhouse SAS*

**AIDALA BERTUNA & KAMINS, P.C.**

/s/ *Imran H. Ansari*
Imran H. Ansari
546 Fifth Avenue, Sixth Floor
New York, New York 10036
(212) 486-0011
iansari@aidalalaw.com

*Attorneys for Joshua Jon Bingham*

**DAVIS+GILBERT LLP**

/s/ Joseph Cioffi
Joseph Cioffi
1675 Broadway
New York, New York 10019
Telephone: (212) 468-4800
jcioffi@dglaw.com

*Attorneys for Armond Noshadeyan*

27

# EXHIBIT A

**Troutman Defendants**

| Name | Adv. Pro. No. |
|---|---|
| Aharon Yojanan King | 24-01529 |
| Alex Michael Riggio | 24-01567 |
| Alexander Dongyeob Shin | 24-01572 |
| Allen Knoll | 24-01593 |
| Amir Jad Naser | 24-03833 |
| Andres Zalguizuri | 24-01528 |
| Antonio Di Fede | 24-02615 |
| Anubi Digital SRL | 24-02622 |
| Benjamin Joseph Cline | 24-01601 |
| Benjamin Michael Klahr | 24-04028 |
| William F Burns | 24-02737 |
| Billeaud Consulting LLC | 24-01629 |
| Brad Joshua Rodriguez | 24-03880 |
| Brett Bothma | 24-02812 |
| Brian T. Slater Revocable Living Trust | 24-03758 |
| Bruce Hae Ung Park | 24-03759 |
| Cedric Alain Fabien Counord | 24-02836 |
| Sim Chin Soong | 24-03641 |
| Christopher W Gafvert | 24-01873 |
| Christopher Donald McCullough | 24-01685 |
| Daniel Lupchi Wong | 24-01936 |
| David Phillip Campano | 24-01999 |
| Derek Christian Pietro | 24-02043 |
| Dustin Curtis Buckley | 24-02076 |
| Eden Piers Kidner | 24-03828 |
| Edwin Joseph Sabec | 24-01801 |
| Elixir Enterprises LLC | 24-01806 |
| Eric Andrew Collisson | 24-01860 |
| Eric Boyd Vogeler | 24-01861 |
| Evolution Computers Inc | 24-01902 |
| Fergus Ellis Harnett | 24-01906 |
| Flat Hills Trust | 24-01911 |
| Gabriel I Robinson | 24-02892 |

| Name | Adv. Pro. No. |
|---|---|
| Gavin Bothma | 24-03094 |
| Genesis Crypto LLC | 24-03845 |
| Geometric Quant Alpha Fund, Ltd | 24-03095 |
| Glen Brian Slater | 24-03848 |
| Hong Min Choi | 24-01963 |
| Hyewon Park | 24-03110 |
| Irina Kurdiani | 24-01992 |
| James B Taing | 24-02018 |
| James Della Femina | 24-02019 |
| James N Gragtmans | 24-03145 |
| Jeremy Paul Cannon | 24-03186 |
| Jonathan Rodriguez | 24-01748 |
| Jordan Alexander Bonilla | 24-03926 |
| Joseph Alan La Monte | 24-01764 |
| Justin Steph Hughes | 24-01713 |
| Kenneth Edwin Payne | 24-01733 |
| Kevin Eugene Calderon | 24-01754 |
| Kipchoge Ivan Cody Spencer | 24-01773 |
| Kyle David Potter | 24-01782 |
| Lyncher One Limited | 24-03229 |
| Marcel Adriaan Sommeling | 24-03311 |
| Mark France Meyers | 24-02349 |
| Mark Zaal Zawaideh | 24-02358 |
| Maximilian Naletich Sarafin | 24-02373 |
| Michael Edward Backo | 24-02385 |
| Michael Kaiway Teng | 24-02182 |
| Michelle Garber | 24-03907 |
| Miha Vidmar | 24-03441 |
| Nicholas Ashton Collins | 24-03474 |
| Norman R Hirsch | 24-02336 |
| Olivia Rodriguez Choi | 24-02159 |
| Paul Robert Campano | 24-02218 |
| Piotr Plewa | 24-03617 |
| Pornenila Shannon Liemthongsamout | 24-03964 |
| Rachel Erica Andrew | 24-03966 |
| Reid Ken Matsumoto | 24-03549 |
| Richard James Telford | 24-03563 |
| Samuel Simon | 24-03499 |

| Name | Adv. Pro. No. |
|---|---|
| Shan Tsai | 24-02320 |
| Sheri Chan | 24-03628 |
| SJ Tech Consulting Trust | 24-02599 |
| Spencer James Henkel | 24-02607 |
| Stephen George Fitzmaier | 24-03786 |
| Stephen W Wong | 24-02623 |
| Sudeep Jesani | 24-02640 |
| Tayrona Investments LLC | 24-02660 |
| Ted S Kim | 24-02661 |
| Theunis Papa | 24-02457 |
| Timothy R OBrien | 24-02695 |
| Tyler Rafael Vickery | 24-02736 |
| Vanessa Magnanini Guzzi | 24-03815 |
| Weave Markets LP | 24-03818 |
| Wei Sheng Ang | 24-03673 |
| Wendy Clark | 24-03674 |
| William Arroyo | 24-02702 |
| William Bardwell Curto | 24-02704 |
| Yoshihiro Luk | 24-02777 |

**Lowenstein Defendants**

| Name | Adv. Pro. No. |
|---|---|
| Calvin Rawe | 24-01607 |
| Chris Zheng | 24-01656 |
| Dennis Cheng | 24-02039 |
| Geoffrey Yuhasker | 24-01993 |
| Hanno Fichtner | 24-02063 |
| Thomas Huggins | 24-02705 |
| Ka Chun Wong | 24-03363 |

**Bressler Defendants**

| Name | Adv. Pro. No. |
|---|---|
| Austin Michael Craig | 24-01569 |
| Kenneth B. Kebbekus | 24-01731 |
| Kuan Kevin Gao | 24-01776 |
| Joseph Trupiano | 24-01788 |
| Daniel Hernandez | 24-01921 |
| Douglas Leon Williams | 24-02073 |
| Richard W. Ferree | 24-02099 |
| Lars Thomas Rydstroem | 24-02128 |
| Litao Liu | 24-02208 |
| Sergey Sergeyevich Demenko | 24-02309 |
| Mehdi France Merali | 24-02375 |
| Tamas Muller | 24-02658 |
| Joshua Michael Anderson | 24-03295 |
| Jacob Matthew Setzer | 24-03856 |

**Proskauer Defendant**

| Name | Adv. Pro. No. |
|---|---|
| Coinhouse SAS | 24-02943 |

**Davis + Gilbert Defendant**

| Name | Adv. Pro. No. |
|---|---|
| Armond Noshadeyan | 24-01555 |

**Aidala Defendant**

| Name | Adv. Pro. No. |
|---|---|
| Joshua Jon Bingham | 24-03288 |